## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.

**YOUTH SEEN**, a Colorado non-profit corporation, and
**TARA J. SMELT**, an individual,

      Plaintiffs,

v.

**TYES INC.**, a Colorado non-profit corporation, and
**ALISHA D. BLACKBURN**, an individual,

      Defendants.

---

## COMPLAINT AND JURY DEMAND

---

Plaintiffs Youth Seen and Tara J. Smelt, PhD ("**Dr. Smelt**" and together, "**Plaintiffs**"), through their undersigned counsel, submit this Complaint and Jury Demand against TYES Inc. ("**TYES**"), and Alisha D. Blackburn ("**Ms. Blackburn**"), an individual.

### PARTIES

1.      Dr. Smelt is an individual who resides in Broomfield County, Colorado.

2.      Youth Seen is a Colorado non-profit corporation with its principal place of business located at 4495 Hale Parkway, Suite 101, Denver, Colorado 80220.

3.      Dr. Smelt is Youth Seen's founder and Executive Director.

4.      Dr. Smelt is a Black/African-American non-binary individual.

5.      Youth Seen is a Colorado non-profit corporation whose mission is to foster and support the social and emotional well-being of LGBTQIA (Lesbian, Gay, Bisexual, Transgender,

Queer, Intersex, and Asexual) youth and their families in all Colorado communities, including rural communities.

6.      TYES (Trans Youth Education & Support) is Colorado non-profit corporation.  Its principal place of business is unknown.  Its mailing address is P.O. Box 812, Lafayette, Colorado 80026.

7.      At all times relevant to this matter, TYES was not a 501(c)(3) organization.

8.      TYES holds itself out on its website as a "network dedicated to helping parents and primary caregivers support their gender expansive youth, and to help families find the information, resources, and understanding they need."

9.      Ms. Blackburn is an individual who, upon information and belief, resides at 1912 E 164th Place, Thornton, Colorado 80602.

10.     During all times relevant to this matter, Ms. Blackburn was part of TYES's Executive team.

11.     In October 2018, Ms. Blackburn filed Articles of Incorporation for a Nonprofit Corporation for TYES with the Colorado Secretary of State.

12.     On the October 2018 filing with the Secretary of State, Ms. Blackburn's husband, Kevin "Doc" Blackburn is listed as TYES's Registered Agent.

## JURISDICTION AND VENUE

13.     This Court has original jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 1981.  This is an action authorized by, and instituted under, Section 1981 of the Civil Rights Act of 1866, as amended by the Civil Rights Act of 1991 ("**Section 1981**").

14.     This Court has jurisdiction over Plaintiffs' state law claims pursuant to

28 U.S.C. § 1367, as Plaintiffs' state law claims arise from the same case and controversy as the

claims over which this Court has original jurisdiction.

15.     The unlawful conduct alleged herein was committed within the judicial district of

the United States District Court for the District of Colorado.  Accordingly, venue is proper in this

District pursuant to 28 U.S.C. § 1391.

## GENERAL ALLEGATIONS

### *Contractual Relationship between TYES and Youth Seen*

16.     Not-for-profit groups that are not 501(c)(3) tax-exempt organizations require

fiscal sponsors to open and maintain bank accounts on their behalf.

17.     In mid- to late-2017, TYES was looking for a new fiscal sponsor.

18.     Reaca Pearl ("**Mx. Pearl**"), upon information and belief a member of TYES's

Executive Team at the time, contacted Youth Seen in 2017 to inquire about Youth Seen acting as

TYES's fiscal sponsor.

19.     After introductions and a number of discussions, together, TYES and Youth Seen

decided a partnership had the potential to benefit both organizations.

20.     On December 21, 2017, TYES and Youth Seen (together, the "**Partners**")

formalized their relationship between by executing a letter Agreement (the "**Agreement**").

21.     The Agreement indicated that Youth Seen would stand as a fiscal sponsor for

TYES.

22.     Initially, the Partners believed Youth Seen could open and maintain a bank

account for TYES, in TYES's name.  The Partners later discovered their desired bank would not

allow Youth Seen to open a bank account in TYES's name, so a new account was created, which held both Youth Seen and TYES's funds (the "**Bellco Account**").

23.     Youth Seen kept records of payments made from, and deposits made to, the Bellco Account.

24.     Youth Seen paid bills for TYES and Youth Seen out of the Bellco Account.

25.     Youth Seen kept track of deposits and withdrawals for each separate organization, keeping a record of each entity's funds available at any given time.

26.     In addition to creating the fiscal sponsorship, the Agreement included other terms governing the relationship between TYES and Youth Seen.

27.     The Agreement provided that the "TYES programming for Youth Seen will be approved by Youth Seen Executive Director prior to implementation to ensure that it matches the mission of the organization and there is money available in the budget to complete the programs."

28.     The Agreement provided that TYES and Youth Seen would work with Youth Seen's grant writer to find and apply for appropriate grants to assist in creation of TYES programming.  The grant writer would receive a percentage of successful grants as compensation for securing the grants.  TYES members were to work with the grant writer to find appropriate grants and implement grant funds.

29.     The Agreement provided that Youth Seen could seek and develop grant funding beyond the needs of TYES for other parts of Youth Seen's mission.

30.     Although the Agreement provided that the Partners intended to have an attorney draw up an additional formal agreement between the Partners, no other contract was ever drafted and the Partners operated under the Agreement at all times relevant to this matter.

31.     The Partners also agreed that Youth Seen would provide administrative support for TYES and build TYES's website and online platforms.

32.     The Partners agreed that TYES would share the administrative costs borne by Youth Seen for work completed for the benefit of and on TYES's behalf.  The administrative costs to be shared between the Partners included overhead costs, such as phone and internet service, as well as compensation for individuals performing administrative tasks, including all of Dr. Smelt's substantive work for the benefit of both entities.

33.     As part of TYES and Youth Seen's partnership, Ms. Blackburn was named, along with another TYES Board member, to the Youth Seen Board of Directors.

34.     In addition to Youth Seen serving as TYES's fiscal sponsor, Dr. Smelt provided significant operations and administrative support to TYES, including managing logistics for programs, marketing and website services, and other services of value to TYES.

35.     Ms. Blackburn and Mx. Pearl suggested that Dr. Smelt should be compensated for their time spent on TYES business and TYES programming.  They suggested that Dr. Smelt's salary should be paid in part by grant funds obtained by TYES.

36.     On March 22, 2018, Ms. Blackburn, in her official capacity as a member of Youth Seen's Board of Directors, signed a letter notifying Dr. Smelt that the Board had agreed to an annual salary of $70,000 for Dr. Smelt's work for both Youth Seen and TYES.

37.     TYES and Ms. Blackburn regularly used Dr. Smelt as proof of TYES's diversity and inclusiveness, but resisted in providing equal and inclusive support to potential members of TYES who were racially diverse.

38.     In one case, an African-American family elected not to join TYES after being subjected to targeted scrutiny by Ms. Blackburn, who demanded information from the family that was unrelated to TYES's mission and not requested from Caucasian families, including information about the neighborhood in which they lived and the parents' professions.

39.     In another case, the parent of a bi-racial, trans child approached Ms. Blackburn to discuss support for the child because of the child's race and gender.  Ms. Blackburn summarily dismissed the parent's concerns and minimized the child's need for support related to race.

***TYES Family Camp – Summer 2018***

40.     TYES holds an annual summer camp for TYES families at YMCA Camp Santa Maria ("**Family Camp**"), located west of Bailey, Colorado.

41.     In preparation for 2018 Family Camp, TYES and Ms. Blackburn negotiated and signed the contract with the YMCA, without Youth Seen's knowledge.  Youth Seen was not provided with any information, notice, or opportunity to approve the terms of TYES's agreement with the YMCA or the cost of the program.

42.     TYES member-families provided funds to attend 2018 Family Camp.

43.     Funds provided by TYES families were deposited in the Bellco Account.

44.     TYES Family Camp concluded in August 2018.

45.     After the invoice for Family Camp was presented to Youth Seen for payment, Youth Seen became aware for the first time that TYES had entered into a contract with the YMCA for 2018 Family Camp.

46.     There were not enough TYES funds in the Bellco Account to pay the invoice. TYES had already spent its available funds on operating costs and other administrative and allocated items.

47.     At a Board Meeting attended by Youth Seen and TYES representatives, Youth Seen advised TYES that TYES did not have enough funds to cover the invoice for Family Camp.

48.     Upon learning this information, Ms. Blackburn, who is Caucasian, immediately accused Dr. Smelt of criminal conduct, and said to others, and anyone who would listen, that Dr. Smelt and Youth Seen stole TYES's money.

49.     When Ms. Blackburn accused Dr. Smelt of stealing the money, she did not consider any other possible reason the funds were not available.  Ms. Blackburn targeted Dr. Smelt, the only Black/African American individual in the room.

50.     Upon information and belief, Ms. Blackburn attacked Dr. Smelt and blindly accused Dr. Smelt of criminal conduct because of Ms. Blackburn's known racial animus toward Black people.

51.     Prior to and after her accusations against Dr. Smelt, Ms. Blackburn repeatedly showed discriminatory bias against Black families seeking to join TYES and would make negative comments about Black youth and families.

52.     Ms. Blackburn also inquired about Dr. Smelt's home address so that Ms. Blackburn could call the police and have Dr. Smelt arrested.

53.    This began a years-long targeted campaign of defamation and false reports by Ms. Blackburn with the primary purpose of having Dr. Smelt arrested and criminally charged, including for theft and embezzlement.

54.    Ms. Blackburn refused to accept or understand the reality of the situation, which was that TYES funds were deposited into the Bellco Account and the funds in the Bellco Account were used to cover TYES's business expenses.

55.    Ms. Blackburn and TYES severed the Agreement between the Partners before Dr. Smelt and Youth Seen could benefit, as intended by the Agreement.

56.    Ms. Blackburn and TYES refused to pay Dr. Smelt their agreed-upon salary.

### *Efforts to Arrest Dr. Smelt*

57.    TYES hired Colorado attorney Constantine (Gus) Spheeris ("**Mr. Spheeris**"), upon information and belief, to assist with its smear campaign against Dr. Smelt.

58.    Dr. Smelt and Mr. Spheeris, who is Caucasian, knew each other prior to the partnership between Youth Seen and TYES, and upon information and belief, before Mr. Spheeris represented TYES.

59.    Dr. Smelt and Mr. Spheeris exchanged angry words when Mr. Spheeris accused Dr. Smelt of playing the "race card." On more than one occasion, Mr. Spheeris made negative comments about Dr. Smelt's race and work with the LGTBQIA community.

60.    Upon information and belief, Mr. Spheeris, acting as TYES's attorney and at the direction of TYES's executive team member Ms. Blackburn, contacted the Boulder District Attorney's office in the Fall of 2018 and demanded criminal charges be filed against Dr. Smelt.

61. Upon information and belief, the Boulder County District Attorney's office referred the matter to the Jefferson County District Attorney's office ("**Jeffco DA**").

62. The Jeffco DA's office assigned investigator John Incampo ("**Mr. Incampo**") to investigate the allegations of criminal conduct made against Dr. Smelt.

63. As a result of the investigation initiated against Dr. Smelt and Youth Seen, Youth Seen was forced to defend itself and Dr. Smelt, and hired attorney Brent Behler ("**Mr. Behler**") during the investigation process, costing Youth Seen and Dr. Smelt significant time, money, and resources.

64. During the Jeffco DA's investigation, Dr. Smelt was required to provide copies of their personal financial account statements, in addition to Youth Seen's financial account statements and ledgers.

65. At all times, Dr. Smelt and Youth Seen fully complied with requests from the Jeffco DA, all the while being disparaged and accused of criminal conduct by Mr. Spheeris, TYES, and Ms. Blackburn among the LGBTQIA communities.

66. Members of Youth Seen's Board of Directors were interviewed extensively.

67. Youth Seen hired a bookkeeper to verify that Youth Seen's bookkeeping was accurate; it was.

68. Out Boulder County's Executive Director, Mardell (Mardi) Moore ("**Ms. Moore**"), was also integral in TYES and Ms. Blackburn's smear campaign against Dr. Smelt.

69. Upon information and belief, Ms. Moore also contacted the Boulder County District Attorney's office about bringing criminal charges against Dr. Smelt.

### *The Complaint Filed with State of Colorado Alleging Embezzlement*

70.      Upon information and belief, TYES and Alisha Blackburn also filed an anonymous, formal complaint against Dr. Smelt and Youth Seen with the Colorado Secretary of State Charities Program (the "**State**"), alleging that Dr. Smelt and Youth Seen violated Colorado's Charitable Solicitations Act (the "**CSA**").

71.      Among the false allegations TYES and Ms. Blackburn made to the State were facts known to TYES and Ms. Blackburn to be false, including that Dr. Smelt both solicited TYES for a partnership and solicited funds from TYES.

72.      In this anonymous complaint, TYES and Ms. Blackburn also falsely alleged that Dr. Smelt spent TYES's funds on their unrelated entity, Tayo, Inc.  This false allegation was motivated by malicious intent and racial bias, as neither TYES nor Ms. Blackburn had any evidence to support their spurious allegations.

73.      These false allegations led the State to request and review Dr. Smelt's personal finances and taxes, and the finances and taxes of Dr. Smelt's unrelated business interests.

74.      Upon information and belief, these false allegations were made for the purpose of harassing and intimidating Dr. Smelt, and to humiliate Dr. Smelt by sending the State to dig through Dr. Smelt's personal records and the records of Dr. Smelt's unrelated business entities.

### *Unanimous Conclusions of Innocence*

75.      On November 22, 2019, the State closed its investigation, concluding that "there was insufficient evidence to show that [Youth Seen] is currently in violation of the Colorado Charitable Solicitations Act."

76.     On December 11, 2020, after a two-year investigation into TYES and

Ms. Blackburn's false allegations against Youth Seen and Dr. Smelt, Thomas Jackson

("**Mr. Jackson**"), Chief Deputy District Attorney of the Economic Crime Unit of the Jeffco DA's

office, notified Mr. Spheeris and Mr. Behler that his office had concluded its investigation into

allegations of criminal conduct by Dr. Smelt and/or Youth Seen.

77.     Mr. Jackson wrote: "The investigation in this case has been extensive and

comprehensive."

78.     Mr. Jackson concluded: "The investigation does not support the allegation that a

theft occurred in this situation.  Therefore, there will be no criminal charges filed as a result of

this investigation."

### *Continuing Smear Efforts*

79.     After receiving the letter from Mr. Jackson, Mr. Spheeris requested a meeting

with the Jeffco DA, which was granted.  The meeting took place on January 20, 2021, via

conference call.

80.     Upon information and belief, Mr. Spheeris demanded the follow-up meeting with

the Jeffco DA on behalf of TYES and at Ms. Blackburn's insistence.

81.     Mr. Spheeris, acting on behalf of TYES and Ms. Blackburn, requested this

meeting in an attempt persuade the Jeffco DA to pursue criminal charges against Dr. Smelt,

despite its conclusion that no criminal conduct had occurred.

82.      Mr. Spheeris and Colorado State House of Representative Brianna Titone

("**State Representative Titone**") attended the meeting with the Jeffco DA on behalf of TYES.

83.     Upon information and belief, State Representative Titone attended the meeting for the sole purpose of asserting political pressure upon the Jeffco DA to file criminal charges against Dr. Smelt.

84.     Prior to the January meeting, State Representative Titone had never been involved in the TYES/Youth Seen partnership.

85.     During this meeting and even after being told yet again by the Deputy District Attorney that there was insufficient evidence to show that a theft had occurred, Mr. Spheeris continued his attempts to persuade the District Attorney's Office to bring criminal charges against Dr. Smelt.

*Damages Suffered by Dr. Smelt and Youth Seen*

86.     Because of TYES, Ms. Blackburn, and Mr. Spheeris's actions, Dr. Smelt has lived under an unjustified cloud of police and State suspicion for years.

87.     As a result of Ms. Blackburn's false accusations and disparaging statements to those in the LGBTQIA community about Dr. Smelt, Dr. Smelt and Youth Seen's reputations have been irretrievably damaged.

88.     Members of the TYES community and greater LGBTQIA community were told by TYES and Ms. Blackburn that Dr. Smelt and Youth Seen stole money from TYES.

89.     Dr. Smelt was threatened with arrest multiple times by Ms. Blackburn and others in the TYES community, and Dr. Smelt was in fear of their safety because of Ms. Blackburn's lies.

90.     Ms. Blackburn and TYES community members disparaged, and continue to disparage, Dr. Smelt and Youth Seen, including upon information and belief, to community organizations that provide grants to organizations like TYES and Youth Seen.

91.     Because of TYES and Ms. Blackburn's targeted campaign to discredit and allege criminal conduct by Dr. Smelt, Youth Seen lost financial support from the Chinook Fund and the Colorado Trust, two important community organizations with a track record of support for Youth Seen.

92.     Because of TYES and Ms. Blackburn's targeted campaign to discredit and allege criminal conduct by Dr. Smelt, Youth Seen has lost thousands of dollars in support for the organization.

### *TYES Pursued Dr. Smelt and Youth Seen Even After Dr. Smelt's Innocence was Conclusively Established*

93.     Even after two independent investigations established that neither TYES nor Dr. Smelt had engaged in wrongdoing with regard to TYES's funds, Ms. Blackburn and TYES continued to disparage and seek criminal action against Dr. Smelt.

94.     As recently as January 2021, TYES and, upon information and belief, Ms. Blackburn, sought to meet with members of the Jeffco DA's office to convince the DA to bring criminal charges against Dr. Smelt, despite the two-year investigation that concluded no criminal conduct had occurred.

95.     Further, TYES and its members sought to use political pressure and a show of force by including State Representative Titone and TYES's attorney in their demands to bring false charges against Dr. Smelt.

96.     Following the January 2021 meeting, Mr. Incampo contacted Mr. Behler by telephone to advise him that TYES was unrelenting its attempts to pursue criminal charges against Dr. Smelt.

97.     In May 2021, Dr. Smelt received confirmation that Out Boulder County's (TYES's former fiscal sponsor) Executive Director Ms. Moore, has continued to disparage Youth Seen and Dr. Smelt in the LGBTQIA community, again falsely accusing them of mishandling funds.

**FIRST CLAIM FOR RELIEF**
**Race Discrimination in Violation of 42 U.S.C. § 1981**
**Dr. Smelt and Youth Seen Against Defendant TYES**

98.     Dr. Smelt and Youth Seen incorporate each of the allegations set forth above, as if fully set forth herein.

99.     At all times relevant hereto, TYES was and is subject to Section 1981.

100.    Dr. Smelt is Black/African-American and is, therefore, a member of a protected class under Section 1981.

101.    TYES knew that Dr. Smelt is Black/African-American.

102.    Section 1981 protects against any impairment of the enjoyment of the benefits of a contract when impairment arises from intentional discrimination based on race.

103.    As the Executive Director of Youth Seen, Dr. Smelt was denied the enjoyment of all benefits, privileges, terms and conditions of Youth Seen's Agreement with TYES.

104.    TYES also refused to pay any portion of Dr. Smelt's agreed-upon salary.

105.    TYES also breached the Agreement by refusing to pay its entire portion of expenses.

106.    TYES additionally breached the Agreement by terminating the Agreement without the required notice and by terminating the Agreement because of Dr. Smelt's race.

107.    The reason TYES denied Youth Seen and Dr. Smelt their bargained-for benefits under the Agreement is because of Dr. Smelt's race.

108.    Dr. Smelt's race led TYES and Ms. Blackburn to accuse Dr. Smelt of criminal conduct and to sever the Partners' relationship prematurely.

109.    TYES intentionally discriminated against Dr. Smelt and Youth Seen because of Dr. Smelt's race.

110.    TYES's racially-motivated conduct denied Dr. Smelt and Youth Seen equal terms, conditions, and benefits under the Agreement, in the Partners' relationship, and in the employment relationship with Dr. Smelt, thereby violating Youth Seen and Dr. Smelt's rights as guaranteed by Section 1981 and the US Constitution.

111.    As a result of TYES's conduct, Dr. Smelt and Youth Seen have been damaged in an amount to be determined at trial, including but not limited to compensatory damages, punitive damages, reasonable attorneys' fees and costs, and pre- and post-judgment interest.

**SECOND CLAIM FOR RELIEF**
**Aiding and Abetting Race Discrimination in Violation of 42 U.S.C. § 1981**
**Dr. Smelt and Youth Seen Against Alisha Blackburn**

112.    Dr. Smelt and Youth Seen incorporate each of the allegations set forth above, as if fully set forth herein.

113.    At all times relevant hereto, TYES was and is subject to Section 1981.

114.    Dr. Smelt's race is Black/African-American and they are, therefore, a member of a protected class under Section 1981.

115.    Ms. Blackburn knew that Dr. Smelt's race is Black/African-American.

116.    Ms. Blackburn's words and actions, including accusations of criminal conduct made against Dr. Smelt, was the reason Dr. Smelt and Youth Seen did not receive the benefits of the Agreement between TYES and Youth Seen.

117.    Through her words and actions, Ms. Blackburn aided and abetted TYES in denying Dr. Smelt and Youth Seen the equal terms, conditions, and benefits under the Agreement, thereby violating Dr. Smelt and Youth Seen's rights as guaranteed by Section 1981.

118.    As a result of Ms. Blackburn's conduct, Dr. Smelt and Youth Seen have been damaged in an amount to be determined at trial, including but not limited to compensatory damages, punitive damages, reasonable attorneys' fees and costs, and pre- and post-judgment interest.

**THIRD CLAIM FOR RELIEF**
**Intentional Infliction of Emotional Distress by Extreme and Outrageous Conduct**
**Dr. Smelt Against TYES and Alisha Blackburn**

119.    Dr. Smelt incorporates each of the allegations set forth above, as if fully set forth herein.

120.    TYES and Ms. Blackburn engaged in conduct they knew, or should have known, would lead Dr. Smelt to suffer emotional distress.

121.    TYES and Ms. Blackburn engaged in a series of acts that a reasonable member of the community would regard as atrocious and beyond all bounds of decency, including by continuously accusing Dr. Smelt of criminal conduct in the tight-knit LGBTQIA community in the Denver Metro area and by relentlessly pursuing criminal charges against Dr. Smelt, even

after both the State of Colorado and the Jeffco DA's office concluded that Dr. Smelt engaged in no criminal wrongdoing, and by submitting false information in pursuit of those charges.

122.     TYES and Ms. Blackburn knew that Dr. Smelt suffered trauma because of prior interactions with individuals who referred to Dr. Smelt using racial slurs (including specific knowledge of Dr. Smelt being called the "n-word" by a YMCA staff member at TYES Family Camp in 2018) and other past instances of conflict imposed upon Dr. Smelt because of Dr. Smelt's race.

123.     TYES and Ms. Blackburn knew, or should have known, that Dr. Smelt was particularly susceptible to emotional distress because of trauma previously inflicted upon Dr. Smelt because of Dr. Smelt's race.

124.     TYES and Ms. Blackburn intentionally engaged in conduct that did, in fact, cause Dr. Smelt severe emotional distress.

125.     TYES and Ms. Blackburn's conduct was extreme and outrageous.  TYES and Ms. Blackburn acted with reckless disregard for Dr. Smelt's rights and feelings, and with deliberate indifference to the certainty that Dr. Smelt would suffer emotional distress.

126.     As a result of TYES and Ms. Blackburn's conduct, Dr. Smelt suffered severe emotional distress, anguish, humiliation, loss of enjoyment of life, loss of reputation, and physical distress.

127.     Dr. Smelt seeks damages to be determined at trial, including but not limited to compensatory damages, punitive damages, costs, and pre- and post-judgment interest.

**FOURTH CLAIM FOR RELIEF**
**Invasion of Privacy based upon Intrusion Upon Seclusion**
**Dr. Smelt Against TYES and Alisha Blackburn**

128.    Dr. Smelt incorporates each of the allegations set forth above, as if fully set forth herein.

129.    TYES and Ms. Blackburn intentionally invaded Dr. Smelt's privacy by repeatedly hounding and harassing her, including by repeatedly attempting to get Dr. Smelt arrested and filing false claims and reports with two different District Attorneys' offices, leading to vast, unnecessary, and expensive state and criminal investigations, which all ultimately ended with total exoneration for Dr. Smelt.

130.    TYES and Ms. Blackburn's actions led the State to request and review Dr. Smelt's personal finances and taxes, and the finances and taxes of Dr. Smelt's unrelated business interests.

131.    Because of TYES and Ms. Blackburn's actions including efforts to continue criminal and other investigations after being informed there was no factual basis for the accusations, Dr. Smelt has lived under an unjustified cloud of police and state suspicion for years, a situation that would be very offensive to any reasonable and person and was, in fact, offensive and damaging to Dr. Smelt.

132.    As a result of TYES and Ms. Blackburn's conduct, not limited to their repeated attempts to have Dr. Smelt arrested, Dr. Smelt suffered severe emotional distress, anguish, humiliation, loss of enjoyment of life, loss of reputation, and physical distress.

133.    Dr. Smelt seeks damages to be determined at trial, including but not limited to compensatory damages, punitive damages, and costs, and pre- and post-judgment interest.

**FIFTH CLAIM FOR RELIEF**
**Breach of Contract**
**Youth Seen and Dr. Smelt Against TYES and Alisha Blackburn**

134.    Dr. Smelt and Youth Seen incorporate each of the allegations set forth above, as if fully set forth herein.

135.    The Agreement between the Partners governed their relationship.

136.    At all times Youth Seen and Dr. Smelt performed under the Agreement.

137.    TYES, through the actions of Ms. Blackburn, breached the Agreement when Ms. Blackburn negotiated and signed a contract with YMCA Camp Santa Maria for TYES 2018 Family Camp, without seeking prior approval from (or notifying) Youth Seen, its fiscal sponsor.

138.    In the Agreement, TYES agreed that "TYES programming for Youth Seen will be approved by Youth Seen Executive Director prior to implementation to ensure that it matches the mission of the organization and there is money available in the budget to complete the programs."

139.    Youth Seen first became aware of this breach when the YMCA presented it with the invoice for 2018 Family Camp in or about September 2018.

140.    Because TYES did not gain its fiscal sponsor's approval for 2018 Family Camp to ensure "there [was] money available," TYES overreached its budget and funds and, when the invoice was to be paid, did not have funds to cover the amount due.

141.    As a result of TYES and Ms. Blackburn's breach of the Agreement, Youth Seen and Dr. Smelt suffered damages to be determined at trial, including damages related to TYES's premature termination of the Agreement.

**SIXTH CLAIM FOR RELIEF**
**Breach of the Duty of Good Faith Fair Dealing**
**Youth Seen and Dr. Smelt Against TYES and Alisha Blackburn**

142.    Dr. Smelt and Youth Seen incorporate each of the allegations set forth above, as if fully set forth herein.

143.    Attendant to the Agreement is an implied duty of good faith and fair dealing.

144.    TYES and Ms. Blackburn each had a duty to act in good faith and deal fairly with Youth Seen and Dr. Smelt under the Agreement, and not to unreasonably or unfairly avoid the benefits conferred by the Agreement and obligations thereunder.

145.    TYES and Ms. Blackburn each had a duty to refrain from arbitrary or unreasonable conduct which has the effect of preventing Youth Seen and Dr. Smelt from received the fruits of the bargain.

146.    TYES and Ms. Blackburn breached the duty of good faith and fair dealing by failing to secure approval for 2018 Family Camp budget and funds, denying responsibility for administrative expenses, and prematurely terminating the Agreement prior to Youth Seen and Dr. Smelt receiving their bargained-for benefits.

147.    As a result of TYES and Ms. Blackburn's breach of the duty of good faith and fair dealing, Youth Seen and Dr. Smelt suffered damages to be determined at trial.

**SEVENTH CLAIM FOR RELIEF**
**Intentional Interference with Prospective Economic or Business Advantage**
**Youth Seen and Dr. Smelt Against TYES and Alisha Blackburn**

148.    Dr. Smelt and Youth Seen incorporate each of the allegations set forth above, as if fully set forth herein.

149.    Youth Seen and Dr. Smelt had a reasonable business expectancy of ongoing relationships with the organizations that provided grant funding to Youth Seen (the "Grantors").

150.    TYES and Ms. Blackburn were aware of Youth Seen and Dr. Smelt's relationships with their Grantors and were aware that Youth Seen and Dr. Smelt expected those relationships to continue.

151.    TYES and Ms. Blackburn intentionally interfered with Youth Seen and Dr. Smelt's relationships with their Grantors by distributing knowingly false information to Grantors in an effort to improperly interfere with Youth Seen and Dr. Smelt's existing and future business expectancy.

152.    Upon information and belief, TYES and Ms. Blackburn engaged in this conduct to ensure that grant funds were provided to TYES instead of Youth Seen.

153.    TYES and Ms. Blackburn improperly and intentionally induced by their publication of false statements and otherwise caused two Grantors – Colorado Trust and Chinook Fund – to refrain from entering into or continuing aspects of their grantor-grantee relationships with Youth Seen and Dr. Smelt, therefore preventing Youth Seen from acquiring or continuing the full benefits of the relationships with Colorado Trust and Chinook Fund.

154.    TYES and Ms. Blackburn improperly and intentionally induced and otherwise caused unknown prospective Grantors to refrain from entering into grantor-grantee relationships with Youth Seen and Dr. Smelt.

155.    TYES and Ms. Blackburn's wrongful acts were willful, oppressive, malicious and/or fraudulent, thereby justifying an aware of punitive damages.

156.     As a direct and proximate result of TYES and Ms. Blackburn's intentional misconduct, Youth Seen and Dr. Smelt have suffered damages in an amount to be determined at trial, including economic damages, emotional distress, and harm to reputation.

## PRAYER FOR RELIEF

WHEREFORE, Youth Seen and Dr. Smelt pray for entry of judgment in their favor and against TYES and Ms. Blackburn as follows:

a.     Economic damages, including without limitation, reimbursement of legal fees and lost grants and sponsorship funds due to TYES and Ms. Blackburn's unfounded and bad faith complaints to the State of Colorado, the Boulder County District Attorney's office and the Jefferson County District Attorney's office, and false statements made in the LGBTQIA communities;

b.     Non-economic damages for severe emotional distress, pain and suffering, inconvenience, mental anguish, loss of reputation, loss of enjoyment of life, and other non-pecuniary losses;

c.     Punitive damages as allowed by law and to be determined at trial;

d.     Reasonable attorneys' fees and costs;

e.     Pre- and post-judgment interest; and

f.     Such other and further relief as the Court deems just and proper.

**PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL CLAIMS SO TRIABLE**

Dated: May 26, 2021

By:    /s/ *Leah P. VanLandschoot*
           Leah P. VanLandschoot, #35723
           Amy M. Maestas, #46925
           THE LITIGATION BOUTIQUE LLC
           1720 S. Bellaire Street, Suite 520
           Denver, Colorado 80222
           Telephone: (303) 355-1942
           Email: lvanlandschoot@thelitbot.com
           Email: amaestas@thelitbot.com
           **ATTORNEYS FOR PLAINTIFFS
           YOUTH SEEN and TARA J. SMELT**

23