**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 21-cv-01429-RM-STV

YOUTH SEEN, and
TARA J. SMELT

      Plaintiffs,

v.

TYES, INC., and
ALISHA D. BLACKBURN,

      Defendants,

v.

REBECCA BERNER a/k/a REBECCA DAVIDSON, and
TAYO, INC.,

      Third-Party Defendants.

_____

**RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE**
_____

Magistrate Judge Scott T. Varholak

      This matter is before the Court on Defendants' Motion to Dismiss the First Amended Complaint and Jury Demand (the "Defendants' Motion") [#61], Counterclaim-Defendant Dr. Tara J. Smelt's Partial Motion to Dismiss Defendant Blackburn's Sixth Counterclaim ("Dr. Smelt's Motion") [#84], Third-Party Defendant Tayo, Inc.'s Motion to Dismiss Third-Party Claims ("Tayo's Motion") [#101], and Third-Party Defendant Rebecca Berner's Motion to Dismiss Third-Party Plaintiffs' Third Claim ("Ms. Berner's Motion") [#102] (collectively the "Motions").  The Motions have been referred to this Court.  [## 63,

85, 104]  The Court has carefully considered the Motions and related briefing, the entire case file, and the applicable case law, and has determined that oral argument would not materially assist in the disposition of the instant Motions.  For the following reasons, the Court respectfully **RECOMMENDS** that: 1) the Defendants' Motion be **GRANTED** to the extent it seeks dismissal of the federal claim, (2) the Court decline to exercise supplemental jurisdiction over any state law claims, and (3) Dr. Smelt's Motion, Tayo's Motion, and Ms. Berner's Motion all be **DENIED WITHOUT PREJUDICE**.

I.   **BACKGROUND**[1]

    A.   **PARTIES**

Plaintiff/Counterclaim Defendant Youth Seen is a Colorado non-profit corporation organized as an exempt organization under 26 U.S.C. § 501(c)(3), whose mission is to foster and support the social and emotional well-being of LGBTQIA (Lesbian, Gay, Bisexual, Transgender, Queer, Intersex, and Asexual) youth and their families.  [##41 at ¶ 5, 41-1 at 1]   Plaintiff/Counterclaim Defendant Dr. Tara Smelt ("Dr. Smelt") is a Black/African-American non-binary individual,[2] and is the founder and Executive Director of Youth Seen.   [#41 at ¶¶ 3–4]   Dr. Smelt also owns, at least in part, Third-Party Defendant Tayo, Inc.  [#99 at 43]  Youth Seen and Dr. Smelt are referred to collectively as "Plaintiffs."

---

[1] The facts are drawn from the allegations in Plaintiffs' First Amended Complaint and Jury Demand [#41], which must be taken as true when considering a motion to dismiss.  *Wilson v. Montano*, 715 F.3d 847, 850 n.1 (10th Cir. 2013) (citing *Brown v. Montoya*, 662 F.3d 1152, 1162 (10th Cir.2011)).  For context, facts specific to the identity of the Third-Party Defendants are drawn from the allegations in Defendants' First Amended Complaint Against Third-Party Defendants Rebecca Berner a/k/a Rebecca Davidson and Tayo, Inc., A Utah Corporation [#99 at 43–54].

[2] The Complaint uses the "singular they" pronoun in reference to Dr. Smelt.  [*See generally* #41]  The Court does likewise.

Defendant/Counterclaim Plaintiff/Third-Party Claim Plaintiff TYES Inc. ("TYES") is a Colorado non-profit corporation not organized as an exempt organization under 26 U.S.C. § 501(c)(3), dedicated to helping parents and primary caregivers support their gender expansive youth.  [#41 at ¶¶ 7–8]  Defendant/Counterclaim Plaintiff/Third-Party Claim Plaintiff Alisha Blackburn ("Ms. Blackburn") was, at various times, a part of TYES's executive team and its Board of Directors.  [*Id.* at ¶ 10]  TYES and Ms. Blackburn are referred to collectively as "Defendants."

Third-Party Defendant Tayo, Inc. ("Tayo") is a Utah corporation, authorized to conduct business in Colorado, that is owned, at least in part, by Dr. Smelt.  [#99 at 43]  Third-Party Defendant Rebecca Berner a/k/a Rebecca Davidson ("Ms. Berner") is a business and personal associate of Dr. Smelt, who was for some time a member of the Youth Seen Board of Directors and who is also associated with Tayo. [*Id.* at 44, 46]  Tayo and Ms. Berner are referred to collectively as "Third-Party Defendants."

## B.    AGREEMENT BETWEEN YOUTH SEEN AND TYES

Because TYES was not a 501(c)(3) exempt organization, it required a fiscal sponsor to open and maintain a bank account on its behalf.  [#41 at ¶¶ 7, 16]  In mid- to late-2017, a member of TYES's executive team contacted Youth Seen to inquire about Youth Seen acting as TYES's fiscal sponsor.  [*Id.* at 18]  After introductions and a number of discussions, TYES and Youth Seen decided that a partnership had the potential to benefit both organizations.  [*Id.* at ¶ 19]  On December 21, 2017, TYES and Youth Seen formalized their relationship by executing a letter Agreement (the "Agreement").  [*Id.* at ¶ 20]  TYES and Youth Seen intended to have an attorney draft an additional, formal agreement between them, but no other contract was ever drafted.  [*Id.* at ¶ 30]  Youth

Seen and TYES operated under the Agreement at all times relevant to this matter.  [*Id.*]
As relevant to the present Recommendation, the Agreement provided that:

- Youth Seen would stand as TYES's fiscal sponsor for the purpose of receiving
  grants.  [#41-1 at 2]

- Youth Seen would maintain a separate bank account for TYES's functions and
  programming, to which the Executive Director (Dr. Smelt) and the Program
  Director (an employee of Youth Seen not individually identifiable from the
  pleadings) would have access.  [*Id.*]

- Youth Seen was to hire a bookkeeper, who would keep and maintain full and
  complete books of accounts for Youth Seen and TYES.  [*Id.*]  The books were to
  be closed at the end of each calendar year and statements were to be prepared
  showing the financial condition of TYES's finances and its profits or loss.  [*Id.*]

- Either party to the Agreement had the right to terminate the Agreement for any
  reason, with 90 days' notice.  [*Id.*]

After the Agreement was executed, it was discovered that, contrary to prior
expectations, Youth Seen would not be allowed to open an account in TYES's name at
their desired bank.  [#41 at ¶ 22]  Youth Seen therefore created a new bank account (the
"Bellco Account") into which funds belonging to both Youth Seen and TYES were
deposited.  [*Id.*]  Youth Seen paid bills for both TYES and Youth Seen out of the Bellco
Account, and it kept a record of deposits and withdrawals for each separate organization.
[*Id.* at ¶¶ 23–25]

As a part of the partnership between Youth Seen and TYES, Ms. Blackburn was
named to the Youth Seen Board of Directors.  [*Id.* at ¶ 33]  On March 22, 2018, Ms.

Blackburn, in her official capacity as a member of Youth Seen's Board of Directors, signed a letter notifying Dr. Smelt that the Board had agreed to an annual salary of $70,000 for Dr. Smelt's work (the "Salary Letter").  [*Id.* at ¶ 36]  That letter noted that the Board had agreed to an annual salary of $70,000 for Dr. Smelt's position of Executive Director with Youth Seen.[3]  [#61-2]  The Salary Letter does not mention TYES.  [*Id.*]

TYES holds an annual summer camp for TYES families at YMCA Camp Santa Maria ("TYES Family Camp").  [#41 at ¶ 43]  In preparation for the 2018 TYES Family Camp, TYES and Ms. Blackburn negotiated and signed a contract with the YMCA.[4]  [*Id.* at ¶ 44]  Some TYES member-families provided funds to attend the 2018 TYES Family Camp, and all funds provided by TYES families were deposited into the Bellco Account.  [*Id.* at ¶¶ 46–47]  The 2018 TYES Family Camp concluded in August 2018.  [*Id.* at ¶ 49]

When the invoice for the 2018 TYES Family Camp was presented to Youth Seen for payment, Youth Seen advised TYES that TYES did not have enough funds in the Bellco Account to cover the invoice.  [*Id.* at ¶¶ 50–52]  TYES had already spent its available funds on operating costs and other administrative and allocated items.  [*Id.* at ¶ 51]  Upon learning this information at a Board Meeting attended by representatives of both Youth Seen and TYES, Ms. Blackburn immediately and publicly accused Dr. Smelt

---

[3] The appropriateness of the Court's consideration of this document without converting Defendants' Motion to one under Fed. R. Civ. Proc. 56 is addressed in section (III)(A)(1)(c), *infra*.

[4] Plaintiffs allege that the YMCA contract was signed "without Youth Seen's knowledge." [#41 at ¶ 44; *see also id.* at ¶¶ 50, 154]  However, it is difficult to understand how this could be the case, given that the contract was negotiated and signed by Ms. Blackburn, who served on Youth Seen's Board of Directors.  [*Id.* at ¶¶ 33, 36, 44]  Indeed, Ms. Blackburn may have been serving at the time as the Chairperson of Youth Seen's Board of Directors.  [*see* #61-2]  Youth Seen would therefore be on notice about the contract its own Board Chairperson had signed on behalf of TYES.

of criminal conduct, alleging that Dr. Smelt and Youth Seen had stolen TYES's money. [*Id.* at ¶¶ 52–53]

A parent-member of TYES offered to mediate between the parties.  [*Id.* at ¶ 57] Defendants declined the offer of mediation because Ms. Blackburn did not want the parent-member to act as mediator.  [*Id.*]  TYES did not explain the reason for its rejection of the mediator.  [*Id.* at ¶ 58]  The proffered moderator saw what Plaintiffs characterize as "objective evidence that neither Dr. Smelt nor Youth Seen had 'stolen' TYES funds" and again offered to moderate, but Defendants again declined.  [*Id.* at ¶¶ 59–60]  Ultimately, on an unspecified date, Ms. Blackburn and TYES terminated the Agreement without providing 90 days' notice.  [*Id.* at ¶¶ 63, 126]

In the fall of 2018, an attorney representing TYES contacted the Boulder County District Attorney's Office in reference to Dr. Smelt's activities and the money TYES believed to be missing.  [*Id.* at ¶ 69]  The Boulder County District Attorney's Office referred the matter to the Jefferson County District Attorney's Office, which assigned an investigator to the matter.  [*Id.* at ¶¶ 70–71]  On December 11, 2020, the Jefferson County District Attorney's Office notified TYES's attorney that "[t]he investigation in this case has been extensive and comprehensive" and that "[t]he investigation does not support the allegation that a theft occurred in this situation. Therefore, there will be no criminal charges filed as a result of this investigation."  [*Id.* at ¶¶ 85–87]  TYES followed up with the Jefferson County District Attorney's Office in an unsuccessful attempt to persuade the District Attorney to pursue criminal charges.  [*Id.* at ¶¶ 88–94, 113]

An anonymous, formal complaint against Dr. Smelt and Youth Seen was filed with the Colorado Secretary of State Charities Program, allegedly by Defendants.  [*Id.* at ¶ 79]

The complaint alleged that Dr. Smelt and Youth Seen violated Colorado's Charitable Solicitations Act, Colo. Rev. Stat. § 6-16-101 *et seq*, and it contained facts known to TYES and Ms. Blackburn to be false.  [*Id.* at ¶ 79–80]  On November 22, 2019, the Colorado Secretary of State Charities Program closed its investigation, concluding that "there was insufficient evidence to show that [Youth Seen] is currently in violation of the Colorado Charitable Solicitations Act."  [*Id.* at ¶ 84]  Defendants also reported their belief that Dr. Smelt and Youth Seen had stolen TYES's funds to other community organizations, including the Colorado Trust, the Chinook Fund, and Out Boulder County (TYES's fiscal sponsor after Youth Seen).  [*Id.* at ¶¶ 103-05, 116, 170]

### C.    ALLEGED RACIAL DISCRIMINATION

Plaintiffs allege that Defendants harbor racial animus toward people of color and Black/African American people, specifically.  [*Id.* at ¶ 55]  In support of this, they offer several allegations, listed in full[5] below.

- TYES and Ms. Blackburn "tokenized" Dr. Smelt, in an attempt to use them as proof to outsiders of TYES's support of diversity and inclusiveness, all while refusing to provide equal and inclusive support to members and potential members of TYES who were racially diverse.  [*Id.* at ¶ 37]

- In one of the initial meetings between TYES and Youth Seen, Dr. Smelt was "openly questioned and disrespected" by a TYES Board Member.  The Board

---

[5] Some of these are factual allegations that, viewed in the light most favorable to the plaintiff, may have a tendency to support a claim of discrimination.  Others are conclusory and unsupported allegations which the Court is not required to accept as true for the reasons discussed in section (III)(A)(2), *infra*.  Still others are not attributable to Defendants.  The Court lists all of the allegations here, including those on which it does not base its Recommendation, in the interest of clarity and completeness.

Member expressed a preference that another attendee, who was Caucasian, lead the meeting instead of Dr. Smelt because the Board Member believed Dr. Smelt did not have an understanding of many of the things to be discussed.  [*Id.* at ¶ 38] The Board Member "ignored Dr. Smelt completely and interrupted Dr. Smelt when they spoke" during that meeting and many others.  [*Id.*]

- Ms. Blackburn "openly disrespected and questioned people of color."  [*Id.* at ¶ 39] Ms. Blackburn commented to Dr. Smelt that she did not understand why Black people think they are oppressed, and openly stated her belief that everyone has an equal chance at opportunities in life.  [*Id.* at ¶ 39]

- Ms. Blackburn requested information from an African-American family considering joining TYES that was not typically requested of prospective families, including information about the neighborhood in which the family lived and the parents' professions.  [*Id.* at ¶ 40] Ms. Blackburn said that the reason she needed additional information from that particular family was because she was not familiar with their background and wondered whether they would follow TYES's guidelines with regard to confidentiality.  [*Id.* at ¶ 41]

- A parent of a bi-racial, trans child inquired about TYES's ability to assist the child because of the child's unique experiences and challenges related to both the child's race and gender identity.  Ms. Blackburn "summarily dismissed" the parent's concerns about the child's race as a reason the child might seek or need support. [*Id.* at ¶ 42]

- Upon learning that TYES's funds in the Bellco Account were insufficient to pay the YMCA invoice, Ms. Blackburn "attacked Dr. Smelt and blindly accused Dr. Smelt

of criminal conduct because of Ms. Blackburn's racial animus toward people of color and Black/African American people, specifically." [*Id.* at ¶ 55; *see also id.* at ¶ 128]  "Ms. Blackburn targeted Dr. Smelt, the only Black/African American individual in the room." [*Id.* at ¶ 54]  TYES terminated the agreement "because of Dr. Smelt's race. The racial bias of TYES's leadership led it to jump to the conclusion that Plaintiffs had engaged in criminal conduct, rather than to listen, investigate, or mediate the facts of the situation surrounding Youth Seen's handling of funds collected for Family Camp." [*Id.* at ¶ 123]

- "Prior to and after her accusations against Dr. Smelt, Ms. Blackburn repeatedly showed discriminatory bias against Black families seeking to join TYES and made negative comments about Black and trans youth and families." [*Id.* at ¶ 56]

- When Ms. Blackburn rejected the offer of a parent-member of TYES to mediate, that parent-member "believed his race, Black/African-American, was the reason for Ms. Blackburn's unwillingness to allow him to act as mediator." [*Id.* at ¶ 58] That parent-member reached this conclusion "[b]ased on his own interactions and experience with Ms. Blackburn." [*Id.*]

- Dr. Smelt and an attorney representing TYES "exchanged angry words while participating in a healing circle, when [the attorney] accused Dr. Smelt of playing the 'race card.'" [*Id.* at ¶ 68]  "On more than one occasion, [the attorney] made negative comments about Dr. Smelt's race." [*Id.*]

- The anonymous complaint filed with the Colorado Secretary of State Charities Program contained a "false allegation . . . motivated by malicious intent and racial bias." [*Id.* at ¶ 81]

- "Ms. Blackburn had in the past accused PFLAG Boulder, TYES's former fiscal sponsor, of misappropriating TYES's funds. . . .  Ms. Blackburn never called police, any district attorney's office, nor reported her suspicions to the State of Colorado, as she did in this case. . . .  PFLAG Boulder's leadership is not Black/African-American."  [*Id.* at ¶ 95]

### D.  PROCEDURAL HISTORY

On May 26, 2021, Plaintiffs initiated the instant action.  [#1]  On October 20, 2021, Plaintiffs filed their First Amended Complaint and Jury Demand (the "Amended Complaint") [## 41 (restricted version), 68 (public version)].  The Amended Complaint alleges six causes of action: (1) Race discrimination in violation of 42 U.S.C. § 1981 ("section 1981"); (2) Intentional Infliction of Emotional Distress by Extreme and Outrageous Conduct ("IIED"); (3) Invasion of Privacy based upon Intrusion Upon Seclusion; (4) Breach of Contract; (5) Breach of the Duty of Good Faith Fair Dealing; and (6) Intentional Interference with Prospective Economic or Business Advantage.  [#41 at 18–27]  On November 12, 2021, Defendants filed the Defendants' Motion seeking to dismiss the Amended Complaint in its entirety.  [#61]  Plaintiffs have Responded to the Defendants' Motion [#81] and Defendants have filed a Reply [#91].

On December 22, 2021, Defendants filed their First Amended Counterclaims against Plaintiffs (the "Amended Counterclaim").  [#80, *reprinted in* #99 at 20–42]  The Amended Counterclaim alleges six causes of action: (1) Civil Theft in violation of Colo. Rev. Stat. § 18-4-405; (2) Conversion in Violation of Colo. Rev. Stat. § 18-4-405; (3) Fraudulent Misrepresentation to Induce Contract; (4) Breach of Contract; (5) Breach of Fiduciary Duty as Fiscal Sponsor; and (6) IIED.  [*Id.*]  Dr. Smelt's Motion was filed on January 5, 2022.  and seeks to dismiss the sixth claim of the Amended Counterclaim.

[#84]  Ms. Blackburn has Responded to Dr. Smelt's Motion [#97], and Dr. Smelt filed a Reply [#100].

On February 8, 2022, Defendants filed a First Amended Complaint Against Third-Party Defendants Ms. Berner and Tayo (the "Third-Party Complaint").  [#99 at 43–52]  The Third-Party Complaint alleges four causes of action: (1) Civil Theft in violation of Colo. Rev. Stat.  §§ 18-4-401(1)  and  18-4-405;  (2)  Conversion;  (3)  Fraudulent Misrepresentation; and (4) Unjust Enrichment.  [*Id.*]  Tayo's Motion was filed on February 22, 2022 and seeks to dismiss the First, Second, and Fourth claims of the Third-Party Complaint.  [#101]  Defendants have Responded to Tayo's Motion [#107], and Tayo filed a Reply [#108].  Ms. Berner's Motion was also filed on February 22, 2022 and seeks to dismiss the Third claim of the Third-Party Complaint.  [#102]  Defendants have Responded to Ms. Berner's Motion [#106], and Ms. Berner filed a Reply [#109].

## II.    STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted."  In deciding a motion under Rule 12(b)(6), a court must "accept as true all well-pleaded factual allegations . . . and view these allegations in the light most favorable to the plaintiff."  *Casanova v. Ulibarri*, 595 F.3d 1120, 1124 (10th Cir. 2010) (alteration in original) (quoting *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009)).  Nonetheless, a plaintiff may not rely on mere labels or conclusions, "and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*,

556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).  Plausibility refers "to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.'"  *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Twombly*, 550 U.S. at 570).  "The burden is on the plaintiff to frame a 'complaint with enough factual matter (taken as true) to suggest' that he or she is entitled to relief."  *Id.*  (quoting *Twombly*, 550 U.S. at 556).  The ultimate duty of the court is to "determine whether the complaint sufficiently alleges facts supporting all the elements necessary to establish an entitlement to relief under the legal theory proposed."  *Forest Guardians v. Forsgren*, 478 F.3d 1149, 1160 (10th Cir. 2007).

## III.   ANALYSIS

Defendants' Motion argues that all of Plaintiffs' claims should be dismissed.  [#61]  First, Defendants argue that Plaintiffs have not stated a valid claim for relief under section 1981.  [*Id.* at 6–12]  Next, Defendants argue that Plaintiffs' tort claims are barred by the statute of limitations.  [*Id.* at 12–13]  Defendants then argue that Plaintiffs have not stated a valid claim for relief for IIED [*Id.* at 14–16] or for Invasion of Privacy [*Id.* at 16–17].  Finally, Defendants argue that Plaintiffs have not stated a valid claim for Breach of Contract [*Id.* at 17–18] or for Interference with Business Advantage [*Id.* at 18–20].  The Court addresses the section 1981 claim individually, and the state-law claims together.  Because all of the claims in the Amended Counterclaim and the Third-Party Claim sound in state law, those claims are addressed together with the state-law claims from the Amended Complaint.

A.     **SECTION 1981**

Defendants seek dismissal of the racial discrimination claims Plaintiffs assert under Section 1981.  [#61 at 6–12]  Section 1981 provides that:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens . . . .  For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

42 U.S.C. § 1981(a)–(b).

To establish a prima facie case under Section 1981, a plaintiff must establish: "(1) that the plaintiff is a member of a protected class; (2) that the defendant had the intent to discriminate on the basis of race; and (3) that the discrimination interfered with a protected activity as defined in § 1981." *Hampton v. Dillard Dep't Stores, Inc.*, 247 F.3d 1091, 1101–02 (10th Cir. 2001) (citing *Reynolds v. Sch. Dist. No. 1, Denver, Colo.*, 69 F.3d 1523, 1532 (10th Cir. 1995)).  Further, "a plaintiff must initially plead and ultimately prove that, but for race, it would not have suffered the loss of a legally protected right."  *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1019 (2020); *see also Grays v. Kittredge Co Partners, LLC*, No. 1:20-cv-00208-WJM-SKC, 2021 WL 1300601, at *4 (D. Colo. Feb. 17, 2021), *report and recommendation adopted*, 2021 WL 1015984 (D. Colo. Mar. 17, 2021).

Here, Plaintiffs have adequately pled the first element of their Section 1981 claim. Plaintiffs have alleged that Dr. Smelt is a Black/African-American individual.  [# 41 at ¶ 4] And Defendants do not dispute that a non-natural person such as Plaintiff Youth Seen "has standing to assert discrimination claims under § 1981 . . . where such discrimination is based on the race of one of its employees."  *Guides, Ltd. v. Yarmouth Grp. Prop. Mgmt.,*

*Inc.*, 295 F.3d 1065, 1072 (10th Cir. 2002) (citing *Gersman v. Group Health Ass'n, Inc.*, 931 F.2d 1565 (D.C.Cir.1991), *vacated on other grounds*, 502 U.S. 1068 (1992)); *see also Hudson Valley Freedom Theater, Inc. v. Heimbach*, 671 F.2d 702, 706 (2d Cir.1982) (holding theater corporation had standing to assert claim alleging it was discriminated against because it sought to involve the black and Hispanic communities).  The Court therefore addresses only the "interference with a protected activity" and the "intent to discriminate on the basis of race" elements of Plaintiffs' section 1981 claim.

### 1.  Interference with a Protected Right

Plaintiffs allege that TYES[6] interfered with their rights to the enjoyment of all benefits, privileges, terms, and conditions of several contractual relationships.  They argue that: (1) TYES refused to abide by the Agreement and terminated the Agreement prematurely [#41 at ¶ 123]; (2) TYES refused to pay its portion of Dr. Smelt's salary, which was agreed upon by the Partners [*id.* at ¶ 124]; TYES breached the Agreement by refusing to pay its portion of expenses [*id.* at ¶ 125]; and that TYES additionally breached the Agreement by terminating the Agreement without the required notice [*id.* at 126].  The Court analyzes the asserted contractual rights with respect to each Plaintiff, and concludes that while TYES has articulated a protected right under Section 1981, Dr. Smelt has not.

### a.  Plaintiff TYES has articulated a Protected Right in the Agreement being terminated only with notice.

Plaintiffs allege that "TYES refused to abide by the Agreement and terminated the Agreement prematurely" [*id.* at ¶ 123], that "TYES also breached the Agreement by

---

[6] Plaintiffs' First Claim for Relief under Section 1981 is brought only against TYES, and not against Ms. Blackburn.

refusing to pay its portion of expenses" [*id.* at ¶ 125], and that "TYES additionally breached the Agreement by terminating the Agreement without the required notice" [*id.* at ¶ 126].   The Court declines to analyze the first two alleged interferences with a protected right, but finds that Youth Seen has sufficiently alleged interference with a right protected under Section 1981 with regards to termination without notice.

The parties do not dispute that the Agreement constitutes a contract between Youth Seen and TYES, even though it was initially intended only as a "Letter of Intent . . . written to define the basic parameters of a future agreement that will be drawn up and approved by a lawyer."  [#41-1 at 1]  Plaintiffs allege that "no other contract was ever drafted and the Partners operated under the Agreement at all times relevant to this matter."  [#41 at ¶ 30]  The Court therefore accepts without deciding that the Agreement is a contract, the enforcement of which is a protected right under section 1981.

The Agreement provides that "[w]ith 90 days notice, either party shall have the right to terminate the Agreement for any reason."  [#41-1 at 2]  Plaintiffs allege the conclusion that "[a]t all times Youth Seen and Dr. Smelt performed under the Agreement."[7]  [#41 at ¶ 153]  Plaintiffs further allege that TYES breached the Agreement

---

[7] The Court notes that a question may exist as to whether Plaintiffs have alleged facts sufficient to establish that they were not in material breach of the Agreement's requirements that "Youth Seen will maintain a separate bank account for TYES functions and programming" and that "[f]ull and complete books of accounts for Youth Seen and TYES shall be kept and maintained by a bookkeeper hired by Youth Seen." [#41-1 at 2]; *see Dalton v. Countrywide Home Loans, Inc.*, 828 F. Supp. 2d 1242, 1255 (D. Colo. 2011) ("Certainly, a party can always opt to continue performing under a contract despite breach or failure of conditions precedent by the other party. Requiring the non-breaching party to do so, however, would be equivalent to making that party accept a material change in the terms of the contract which is beyond the scope of the implied duty of good faith and fair dealing.") (citing *CoBank, ACB v. Reorg. Farmers Coop. Ass'n*, 170 F. App'x 559, 566 (10th Cir.2006).  Because Defendants have not raised this challenge, however, the Court finds that the present Recommendation is not the appropriate venue to address the issue.

by terminating it without the required notice.   [*Id.* at ¶ 126].   The Court finds these allegations sufficient, at this stage, to establish a plausible claim that TYES had a protected interest in the Agreement not being terminated without notice.

> **b.      Dr. Smelt is not a third-party beneficiary with a protected interest in the Agreement.**

Defendant argues that Dr. Smelt has no standing to bring a cause of action under the Agreement because they were neither a party nor a third-party beneficiary of the contract.  [#61 at 18]  Plaintiffs maintain that Dr. Smelt was a third-party beneficiary of the Agreement and that they therefore had a protected interest in the enjoyment of all benefits, privileges, terms, and conditions of the Agreement as an individual.   [#41 at ¶ 122]  The Court agrees that Dr. Smelt lacks standing under the Agreement.

"The Tenth Circuit has . . . suggested that an *intended* third-party beneficiary to a contract may assert a § 1981 claim in relation to that contract."  *Farris v. Stepp*, No. 20-CV-02346-DDD-NYW, 2021 WL 5200210, at *5 (D. Colo. Nov. 9, 2021) (emphasis in original) (citing *Hampton v. Dillard Dep't Stores, Inc.*, 247 F.3d 1091, 1119 (10th Cir. 2001)).  Under Colorado law, a third-party beneficiary to a contract is an individual who, despite not being a signatory to the contract, is "'intended by the other parties to be a direct beneficiary of that agreement.'"  *Otimo Music, Inc. v. Royalty Exch., Inc.*, No. 18-CV-00006-RBJ, 2018 WL 6697073, at *3 (D. Colo. Dec. 20, 2018) (quoting *Villa Sierra Condo. Ass'n v. Field Corp.*, 878 P.2d 161, 166 (Colo. App. 1994)).  "'[T]hat intent may be evidenced either from the terms of the agreement, the surrounding circumstances, or both.'"  *Id.*  The benefit to the third-party must be "direct and not merely an incidental benefit of the contract."  *Jefferson Cnty. Sch. Dist.*, 826 P.2d at 843 (citing *E.B. Roberts Construction Co. v. Concrete Contractors, Inc.*, 704 P.2d 859, 865 (Colo.1985); *see also*

16

*Hampton*, 247 F.3d at 1119 ("The benefit to the third party must be more than merely incidental to the contract; it must be part of the condition or consideration for the contract." (quotation omitted)).   A third-party who receives incidental benefit from performance under a contract, but who is not an intended beneficiary of a contract, has no right to sue to enforce the contract.  *Hampton*, 247 F.3d at 1119.

Plaintiffs argue that Dr. Smelt was an intended third-party beneficiary of the Agreement because all parties knew that Dr. Smelt was the Executive Director of Youth Seen at the time the Agreement was entered into, and the Agreement assigned roles and responsibilities to the Executive Director.  [## 81 at 17, 41 at ¶ 122, 41-1 at 2]  In support of that proposition, Plaintiffs cite to *E.B. Roberts Construction*, where the Colorado Supreme Court found that a third-party contractor was an intended third-party beneficiary because the contract amendment was entered into with the understanding that the third-party contractor would do the work.  704 P.2d at 865.  That case is distinct from the present dispute, however, because the third-party contractor in *E.B. Roberts Construction* was merely substituted out as a contractual party because of its inability to obtain a required performance bond, but all parties "understood that [the third-party] was to perform the work and be the ultimate recipient of the compensation."  *Id.*  In essence, the contracting party in *E.B. Roberts Construction* acted as a pass-through entity for the third-party, which would have signed the contract itself but for its inability to secure the required bond.  *Id.*

The case at bar is markedly different, and Plaintiffs do not argue that Dr. Smelt would have signed the Agreement themselves but for some disability.  [*See generally* ## 41, 81]  Rather, the facts more closely resemble cases in which courts have found the

employees of a company not to be third-party beneficiaries of the contracts entered into by their employers. *See*, *e.g.*, *Genberg v. Porter*, 935 F. Supp. 2d 1094, 1101–02 (D. Colo. 2013), *aff'd in part, appeal dismissed in part*, 566 F. App'x 719 (10th Cir. 2014) (finding executives at a company not to be intended third-party beneficiaries of an employment contract between their employer and another employee because the contract "does not mention any of the defendants and it does not manifest any intention by [the contract parties] to impart a benefit to the defendants, other than the far attenuated and normal value of an employee fulfilling his job duties[;] any benefit received by the defendants is incidental and insufficient to render the defendants third party beneficiaries"); *Haggins v. Verizon New England, Inc.*, 648 F.3d 50, 57 (1st Cir. 2011) (under comparable Massachusetts law, telephone equipment installers were not third-party beneficiaries of contract between employer and wireless carrier to provide cell phone service, absent any evidence to show any third-party beneficiary status in employees was intended); *Wallace v. Texaco, Inc.*, 681 F.2d 1088, 1090 (5th Cir. 1982) (under Louisiana law, employee oil worker was not an intended third-party beneficiary of a contract between his employer and the owner of offshore oil rig platform under which the employer agreed to furnish the employee's labor to the oil rig).

Beyond the assertion that Dr. Smelt was an intended third-party beneficiary of the Agreement by virtue of their role as Executive Director of Youth Seen, Plaintiffs do not allege facts that would constitute benefits that the signatories of the Agreement directly intended to benefit Dr. Smelt individually. The Court therefore concludes that Dr. Smelt has no protected interest in the enforcement of the Agreement.

> **c.**   **Dr. Smelt fails to plausibly plead their entitlement to a salary.**

Plaintiffs assert that "TYES refused to pay its portion of Dr. Smelt's salary, which was agreed upon by the Partners." [#41 at ¶ 124] The Agreement contains no reference to a salary for Dr. Smelt. [*see generally* #41-1] In support of their allegation that TYES had a contractual obligation to pay Dr. Smelt a salary, Plaintiffs allege that:

> Ms. Blackburn and [another member of TYES's executive team] suggested that Dr. Smelt should be compensated for their time spent on TYES business and TYES programming. They suggested that Dr. Smelt's salary should be paid in part by grant funds obtained by TYES. On March 22, 2018, Ms. Blackburn, in her official capacity as a member of Youth Seen's Board of Directors, signed a letter notifying Dr. Smelt that the Board had agreed to an annual salary of $70,000 for Dr. Smelt's work for both Youth Seen and TYES.

[#41 at ¶¶ 35–36]

Nowhere do Plaintiffs allege that TYES committed itself to paying Dr. Smelt a salary, only that Ms. Blackburn (acting "in her official capacity as a member of *Youth Seen's* Board of Directors" (emphasis added)) signed a letter affirming that "the Board" had agreed to pay Dr. Smelt a salary. [*Id.* at ¶ 36] It is unclear how someone acting in her official capacity as a member of the Youth Seen Board of Directors could commit TYES to a contract. Nor do Plaintiffs see fit to include the Salary Letter as an Exhibit to the Amended Complaint.

Defendants, however, do attach the Salary Letter as an exhibit to their Motion to Dismiss. [#61-2] Plaintiffs argue that the Court may not consider this document not included in their pleading without converting Defendants' Motion to one for summary judgment, as typically required by Federal Rule of Civil Procedure 12(d). [#81 at 3–4] The Court disagrees. At the motion dismiss stage, a court may "consider documents attached to or referenced in the complaint if they 'are central to the plaintiff's claim and

the parties do not dispute the documents' authenticity.'" *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1103 (10th Cir. 2017) (quoting *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002)); *see also GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997) ("[I]f a plaintiff does not incorporate by reference or attach a document to its complaint, but the document is referred to in the complaint and is central to the plaintiff's claim, a defendant may submit an indisputably authentic copy to the court to be considered on a motion to dismiss.").

Plaintiffs refer to the Salary Letter several times in the Amended Complaint.  [#41 at ¶¶ 35–36, 64, 124]  Further, the Court finds that the Salary Letter is central to Plaintiffs' First Claim, which is predicated at least in part on TYES's failure to pay the salary it allegedly owed Dr. Smelt.  [*Id.* at ¶ 124]  Finally, while Plaintiffs object to the Court's consideration of the Salary Letter, and cite to cases in which extrinsic documents were not "indisputably authentic," Plaintiffs do not dispute the authenticity of the Salary Letter. [#81 at 3–4]  Therefore, the Court considers the contents of the Salary Letter [#61-2] without converting Defendants' Motion to one under Federal Rule of Civil Procedure 56.

The Salary Letter is printed on Youth Seen letterhead.  [#61-2]  Its subject line is "Salary for Executive Director Position – Youth Seen[.]"  [*Id.*]  It offers Dr. Smelt a salary "for your position of Executive Director with Youth Seen."  [*Id.*]  It refers to "the size of the organization" in the singular.  [*Id.*]  Nowhere does the Salary Letter name TYES or reference TYES directly or indirectly.  [*See generally id.*]  Nowhere does it include any indicia of endorsement by any individual other than Ms. Blackburn, whom it identifies as "Board Chairperson."  [*See id.*]

The Court struggles to understand how the Salary Letter could fairly be characterized as providing a salary "for Dr. Smelt's work for both Youth Seen and TYES" [#41 at ¶ 36] when TYES is never referenced in the document.  The Court therefore finds that Plaintiffs have failed to plead that Dr. Smelt was entitled to any salary from TYES that could constitute a protected contractual interest under section 1981.

For these reasons, and for the reasons stated in Section III.A.1.b above (assessing whether Dr. Smelt was a third-party beneficiary of the Agreement), the Court respectfully RECOMMENDS that the Defendants' Motion be GRANTED to the extent it seeks to dismiss the First Claim for relief under Section 1981 as brought by Dr. Smelt. Nonetheless, because it is possible—though for the reasons outlined herein, the Court believes unlikely—that Dr. Smelt could state a plausible Section 1981 claim, the Court RECOMMENDS that Claim One be DISMISSED WITHOUT PREJUDICE to the extent that it is brought by Dr. Smelt.  *Reynoldson v. Shillinger*, 907 F.2d 124, 127 (10th Cir. 1990) (holding prejudice should not attach to dismissal when plaintiff has made allegations "which, upon further investigation and development, could raise substantial issues").

### 2.      Intent to Discriminate on the Basis of Race

Defendants argue that Plaintiffs have failed to plead sufficient factual matter, accepted as true, to state a facially plausible claim that TYES intended to discriminate against Dr. Smelt and Youth Seen on the basis of race.  [## 61 at 7–10, 91 at 5–7]  The Court agrees.

It is well established that "[o]nly intentional discrimination may violate section 1981."  *Durham v. Xerox Corp.*, 18 F.3d 836, 839 (10th Cir. 1994), *cert. denied*, 513 U.S. 819 (1994) (citing *General Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 391

(1982)).  "A plaintiff alleging discrimination on the basis of race may prove intentional discrimination through either direct evidence of discrimination (e.g., oral or written statements on the part of a defendant showing a discriminatory motivation) or indirect (i.e., circumstantial) evidence of discrimination."  *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1226 (10th Cir. 2000).  Here, Plaintiff have not presented any direct evidence of discrimination and the allegations that TYES terminated the Agreement "because of Dr. Smelt's race" [#41 at ¶ 127] and that "[t]he racial bias of TYES's leadership led it to jump to the conclusion that Plaintiffs had engaged in criminal conduct" [*id.* at ¶ 123] are conclusory, and not entitled to the presumption of truth.[8]  *See Armour v. Universal Prot. Servs.*, 724 F. App'x 663, 665 (10th Cir. 2018) (an "allegation that the plaintiff was 'targeted because of her race,' without more, was conclusory") (citing *Khalik v. United Air Lines*, 671 F.3d 1188, 1193 (10th Cir. 2012).

The Court thus turns to whether the Plaintiffs have plausibly pled an intent to discriminate based upon allegations related to indirect evidence of discrimination.  When circumstantial evidence of intentional discrimination is offered to support a claim under Section 1981, courts apply the burden shifting framework first articulated in the Title VII

---

[8] For example, Plaintiffs allege that, upon learning that available TYES funds in the Bellco Account were insufficient to pay the YMCA invoice, "Ms. Blackburn immediately and publicly accused Dr. Smelt of criminal conduct" [#41 at ¶¶ 52–53] and that Ms. Blackburn did so "because of Ms. Blackburn's racial animus toward people of color and Black/African American people" [*id.* at ¶ 55].  But Plaintiffs fail to allege direct evidence that could support the conclusion that Ms. Blackburn's allegations were founded in racial animus. Similarly, Plaintiffs allege that "TYES refused to abide by the Agreement and terminated the Agreement prematurely because of Dr. Smelt's race" and that the "racial bias of TYES's leadership led it to jump to the conclusion that Plaintiffs had engaged in criminal conduct, rather than to listen, investigate, or mediate the facts of the situation surrounding Youth Seen's handling of funds collected for Family Camp."  [*Id.* at ¶ 123]  But, once again, Plaintiffs fail to allege any direct evidence supporting the conclusory statement that TYES was acting due to a racial bias.

context by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973).  *Reynolds v. Sch. Dist. No. 1, Denver, Colo.*, 69 F.3d 1523, 1533–34 (10th Cir. 1995); *see also Durham*, 18 F.3d at 839 (applying *McDonnell Douglas* to a section 1981 claim).  "The prima facie case under *McDonnell Douglas*, however, is an evidentiary standard, not a pleading requirement."  *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 510 (2002).  As the Supreme Court explained, "under a notice pleading system, it is not appropriate to require a plaintiff to plead facts establishing a prima facie case because the *McDonnell Douglas* framework does not apply in every . . . discrimination case" — e.g., where a plaintiff is able to produce direct evidence of discrimination.  *Id.* at 511.  The Supreme Court further cautioned that "the precise requirements of a prima facie case can vary depending on the context" and thus "it may be difficult to define the precise formulation of the required prima facie case in a particular case" before "discovery has unearthed relevant facts and evidence."  *Id.* at 512.

Although a plaintiff is not required to set forth a prima facie case of discrimination in the complaint, they are "required to set forth plausible claims."  *Khalik*, 671 F.3d at 1193.  The plaintiff may not merely rely upon "the type of conclusory and formulaic recitations disregarded by the Court in *Iqbal*."  *Id.*  "While specific facts are not necessary, [ ] some facts are."  *Id.* (internal quotation omitted).  Moreover, although the plaintiff is not required to allege a prima facie case, "[t]he inferences offered by the *McDonnell Douglas* framework assist judges in resolving motions to dismiss by providing an analytical framework to sift through the facts alleged."  *Morman v. Campbell Cty. Mem'l Hosp.*, 632 F. App'x 927, 933 (10th Cir. 2015); *see also Khalik*, 671 F.3d at 1192 (finding that "the

elements of each alleged cause of action help to determine whether [the plaintiff] has set forth a plausible claim").

Setting aside unsupported conclusory allegations and acts that cannot be attributed to TYES, the Court is left with the following facts, which it accepts as true:

- In one of the initial meetings between TYES and Youth Seen, a TYES board member "openly questioned and disrespected" Dr. Smelt, "ignored Dr. Smelt completely and interrupted Dr. Smelt when they spoke," and asserted a preference that another attendee, who was Caucasian, should lead a meeting rather than Dr. Smelt because the other individual had a greater understanding of the issues to be discussed.  [#41 at ¶ 38]  Plaintiffs do not allege that this board member was in any way involved in the decision to terminate the Agreement.

- Ms. Blackburn commented to Dr. Smelt that she "did not understand why Black people think they are oppressed" and stated her belief that "everyone has an equal chance at opportunities in life."  [*Id.* at ¶ 39]

- Ms. Blackburn requested information from an African-American family considering joining TYES that was not typically requested of prospective families, including information about the neighborhood in which the family lived and the parents' professions.  Ms. Blackburn said that the reason she needed additional information was because she was not familiar with the family's background and wondered whether they would follow TYES's guidelines with regard to confidentiality.  [*Id.* at ¶¶ 40–41]

- A parent of a bi-racial, trans child inquired about TYES's ability to assist the child because of the child's unique experiences and challenges related to both the

child's race and gender identity.  Ms. Blackburn "summarily dismissed" the parent's concerns about the child's race as a reason the child might seek or need support. [*Id.* at ¶ 42]   Plaintiffs do not allege that the bi-racial family was in any part Black/African-American.

- A Black/African-American parent-member of TYES offered to mediate between the parties, but Ms. Blackburn did not want the parent-member to act as a mediator. TYES did not provide an explanation why the proposed mediator was unacceptable.  [*Id.* at ¶¶ 57–58]

The Court must determine whether these factual allegations, viewed in the light most favorable to Plaintiffs, nudge the claim — that TYES had the intent to discriminate on the basis of race in its termination of the Agreement — across the line from conceivable to plausible.  The Court cannot conclude that they do, both because there is no evidence that the allegedly discriminatory actions were close in time to the termination of the agreement, and because, taken together, they are insufficient to establish discriminatory intent.

While Plaintiffs have failed to identify the timing of many of the events alleged and enumerated above, there is no indication that any of them — with the possible exception of the decision to decline the offer of mediation — occurred close in time to the termination of the Agreement.   Indirect evidence of discrimination occurring close in time to a challenged action has more tendency to suggest that the action was taken with discriminatory intent than evidence from long before.  *Compare Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 531 (10th Cir.1994) ("Isolated comments, unrelated to the challenged action, are insufficient to show discriminatory animus.") *with* Sampson v.

Norwest Fin., Inc., 94 F.3d 656, 1996 WL 463886, at *2 (10th Cir. 1996) (unpublished table opinion) (if "disparate treatment occurs accompanied by a racist remark, even a single one, such conduct will sufficiently indicate that racial animus provided a motivating factor of the disparate treatment and, therefore, will support a claim under § 1981"). Because Plaintiffs have failed to plead that the instances above occurred close in time to the termination of the Agreement, their tendency to show discriminatory intent is reduced.

Even interpreting the allegations in the light most favorable to Plaintiffs, as the Court must at this stage, the facts pleaded fail to establish a reasonable presumption of discriminatory intent.  Plaintiffs have alleged concrete facts that: (1) a TYES leader acted unprofessionally towards Dr. Smelt in a meeting, and preferred that another individual, who was Caucasian, lead that meeting; (2) Ms. Blackburn once articulated skepticism about the degree of discrimination that Black/African-American individuals face; (3) Ms. Blackburn asked unusual questions of a Black/African-American family to ensure they would maintain TYES's confidentiality standards; (4) Ms. Blackburn dismissed race-based concerns of a bi-racial prospective family; and (5) Ms. Blackburn declined the offer of a Black/African-American parent-member to act as mediator in the dispute over TYES's funds.  The Court cannot conclude that these allegations nudge the claim that TYES intentionally discriminated on the basis of race in its termination of the Agreement across the line from conceivable to plausible.  *Cone*, 14 F.3d at 531; *Vasilescu v. Black & Veatch Pritchard, Inc.*, 155 F. Supp. 2d 1285, 1293 (D. Kan. 2001) ("While [protected category-based] comments made by a decision maker may support an inference of discrimination, 'isolated [or] ambiguous comments' may not support such an inference." (quoting *Stone v. Autoliv ASP, Inc.*, 210 F.3d 1132, 1140 (10th Cir. 2000))).  Accordingly, the Court

respectfully RECOMMENDS that Claim One be DISMISSED WITHOUT PREJUDICE to the extent it is brought by Youth Seen.[9]  *Reynoldson*, 907 F.2d at 127.

**B.    STATE LAW CLAIMS**

Claims Two through Six of the Amended Complaint, as well as all claims raised in Defendants' Amended Counterclaims [#80] and Third-Party Claims [#99], state allegations that sound in Colorado state law.  Having found that Plaintiffs' federal section 1981 claim should be dismissed, the Court further Recommends that the Presiding Judge decline to exercise supplemental jurisdiction over Plaintiffs' state law claims or the state law claims advanced by Defendants in their Amended Counterclaims and Third-Party Claims.   When a district court has dismissed all claims over which it has original jurisdiction, 28 U.S.C. § 1367(c)(3) expressly authorizes the court to decline to exercise supplemental jurisdiction over any remaining state law claims.  "Whether to exercise supplemental jurisdiction under such circumstances lies within the discretion of the court" and "[n]otions of comity and federalism demand that a state court try its own lawsuits, absent compelling reasons to the contrary."  *Sauer v. McGraw-Hill Cos.*, No. 99 N 1898, 2001 WL 1250099, at *18 (D. Colo. June 12, 2001) (quotations omitted).  As a result, a district court will generally decline the exercise of supplemental jurisdiction when all federal claims have been eliminated prior to trial.  *See id.* (citing *Carnegie-Mellon Univ. v.*

---

[9] Defendants also argue that Plaintiffs have failed to sufficiently plead that but for racial discrimination, Plaintiffs would not have lost their contractual rights protected under section 1981.  [#61 at 10–11]  The Supreme Court has held that, to prove a violation of section 1981, a plaintiff "must initially plead and ultimately prove that, but for race, it would not have suffered the loss of a legally protected right."  *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1019 (2020).  Here, because Plaintiffs have failed to allege a discriminatory intent, they have likewise failed to plausibly allege that any racial animus was the "but for" cause of their loss of any legally protected right.

*Cohill*, 484 U.S. 343, 350 n. 7 (1988)); *see also Aery v. Bd. of Cty. Comm'rs of Tulsa Cty.*, 696 F. App'x 360, 361 (10th Cir. 2017) ("When all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state claims." (quotation omitted)).   Here, particularly given the early stage of these proceedings, the Court respectfully RECOMMENDS that the district court decline to exercise jurisdiction over the state law claims and that those claims thus be DISMISSED WITHOUT PREJUDICE, so that Plaintiffs and Counterclaim-Plaintiffs/Third-Party Plaintiffs may refile them in the appropriate state court.[10]

## VI.   CONCLUSION

For the foregoing reasons, the Court respectfully **RECOMMENDS** that: 1) the Defendants' Motion to Dismiss the First Amended Complaint and Jury Demand [#61] be **GRANTED** to the extent it seeks dismissal of the federal claim; (2) the Court decline to exercise supplemental jurisdiction over any state law claims; and (3) Dr. Tara J. Smelt's Partial Motion to Dismiss Defendant Blackburn's Sixth Counterclaim [#84], Third-Party Defendant Tayo, Inc.'s Motion to Dismiss Third-Party Claims [#101], and Third-Party

---

[10] As outlined above, the Court is recommending that Plaintiffs' federal claim be dismissed without prejudice and that Plaintiffs be permitted an opportunity to amend the Amended Complaint to attempt to cure the deficiencies identified herein.   Nonetheless, the Court does not believe that it is appropriate to address the merits of the state law claims raised by Plaintiff and by Counterclaim-Plaintiffs/Third-Party Plaintiffs unless and until Plaintiffs can plausibly allege a federal claim and thereby properly assert supplemental jurisdiction over the state law claims.   *Sauer v. McGraw-Hill Cos.*, No. 99 N 1898, 2001 WL 1250099, at *18 (D. Colo. June 12, 2001) ("Whether to exercise supplemental jurisdiction under such circumstances lies within the discretion of the court" and "[n]otions of comity and federalism demand that a state court try its own lawsuits, absent compelling reasons to the contrary." (quotations omitted)).

Defendant Rebecca Berner's Motion to Dismiss Third-Party Plaintiffs' Third Claim [#102]

all be **DENIED WITHOUT PREJUDICE**.[11]


DATED:  July 14, 2022                                   BY THE COURT:

                                                        s/Scott T. Varholak
                                                        United States Magistrate Judge

---

[11] Within fourteen days after service of a copy of this Recommendation, any party may serve and file written objections to the magistrate judge's proposed findings of fact, legal conclusions, and recommendations with the Clerk of the United States District Court for the District of Colorado.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *Griego v. Padilla (In re Griego)*, 64 F.3d 580, 583 (10th Cir. 1995).  A general objection that does not put the district court on notice of the basis for the objection will not preserve the objection for *de novo* review.   "[A] party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for *de novo* review by the district court or for appellate review."   *United States v. 2121 East 30th Street*, 73 F.3d 1057, 1060 (10th Cir. 1996).  Failure to make timely objections may bar *de novo* review by the district judge of the magistrate judge's proposed findings of fact, legal conclusions, and recommendations and will result in a waiver of the right to appeal from a judgment of the district court based on the proposed findings of fact, legal conclusions, and recommendations of the magistrate judge. *See Vega v. Suthers*, 195 F.3d 573, 579-80 (10th Cir. 1999) (holding that the district court's decision to review magistrate judge's recommendation *de novo* despite lack of an objection does not preclude application of "firm waiver rule"); *Int'l Surplus Lines Ins. Co. v. Wyo. Coal Refining Sys., Inc.*, 52 F.3d 901, 904 (10th Cir. 1995) (finding that cross-claimant waived right to appeal certain portions of magistrate judge's order by failing to object to those portions; *Ayala v. United States*, 980 F.2d 1342, 1352 (10th Cir. 1992) (finding that plaintiffs waived their right to appeal the magistrate judge's ruling by failing to file objections).   *But see, Morales-Fernandez v. INS*, 418 F.3d 1116, 1122 (10th Cir. 2005) (holding that firm waiver rule does not apply when the interests of justice require review).